IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

SHARON D.  STEWART,            )

     PLAINTIFF,                )

VS.                           )          CV99-H-3005-NE

ZENITH ELECTRONICS CORP.,     )

     DEFENDANT.                )

**ENTERED**

**JAN 2 2 2001**

## MEMORANDUM OF DECISION

The court has before it the December 1, 2000 motion of defendant Zenith Electronics Corp. for summary judgment in its favor with regard to each of the claims asserted or arguably asserted by plaintiff in the complaint.[1]  Pursuant to the December 1, 2000 order, the motion was deemed submitted, without oral argument, on December 29, 2000.

---

[1]  The court says "arguably asserted" because of the general "shotgun" allegations in the complaint.  The complaint challenges a variety of employment decisions, asserting such decisions violated Title VII in that the decisions were motivated by plaintiff's gender and race and in retaliation for protected activity.  The compliant also asserts a hostile environment claim predicated upon gender and race.  It is clear from the briefs of the parties submitted in connection with the motion for summary judgment that the actual claims  of plaintiff are not quite so broad.

## I. Procedural History

Plaintiff Sharon D. Stewart commenced this action on November 9, 1999 by filing a complaint asserting claims under Title VII for a variety of employment decisions made or allegedly made during plaintiff's employment with defendant.  Specifically she claims that defendant failed to promote her on several occasions and terminated her employment because of her sex, because of her race, and in retaliation for her complaining to EEOC about employment decisions of defendant.  She also claims in her complaint that defendant created a gender and racial hostile environment.  And in her brief plaintiff adds to her disparate treatment and retaliation claims a January 29, 1999 adverse performance report for 1998.  Defendant's December 1, 2000 motion for summary judgment asserts that there are no genuine issues of material fact regarding any of plaintiff's claims and that defendant is entitled to judgment as a matter of law.  The parties have each filed briefs (Doc #39, 46, 50, 56) and submitted evidence (Doc # 35, 36, 37, 38, 40, 41, 42, 43, 44, 45) in support of their respective positions concerning the pending motions.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. Id. at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial. Id. at 324.

The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such

3

that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact, i.e., facts that would entitle it to a directed verdict if not controverted at trial.  Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this

4

method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  <u>Fitzpatrick</u>, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  <u>Lewis v. Casey</u>, 518 U.S. 343, 358 (1996) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts

Plaintiff is an African-American female.  She was hired by defendant and started work July 14, 1997 in the position of Customer Service Lead, a non-supervisor position.  Her immediate supervisor held the position of Customer Service Supervisor. When that position became vacant, on the recommendation of two other supervisors, Dewayne Jeter, the Parts Sales Manager who made the initial decision to hire plaintiff, promoted plaintiff to the position of Customer Service Supervisor about September 30, 1997, without "posting" the position.  (Plaintiff's Aff.; Jeter Dep. 30-31).  In that position plaintiff reported to Jeter. For her employment period July 1997 - December 1997 Jeter gave her an OVERALL A RATING which essentially reflects that plaintiff achieved expectations.  (Jeter dep. 30, 101 and plaintiff's Ex. 53 thereto).  In January 1998 plaintiff became aware that Jeter was having problems with plaintiff's job performance and started having discussions with him about her performance.  (Plaintiff's Aff.).  The problems[2] continued

---

[2]  Jeter testified that plaintiff was constantly late to work, refused to submit regular weekly reports to him, "pretty much refused" to use the time card system, "just wouldn't do what was asked," took long lunches and always had a backlog of work. (Jeter Dep. 48-50).  He also testified that on several occasions he received reports from other managers that plaintiff was doing school work during her working time.  (Jeter Dep. 167-67).

through the balance of her employment (Jeter Dep. 48-50) and were
the subject of meetings between plaintiff and Jeter.   The
situation clearly deteriorated as 1998 progressed.   Examples of
such deterioration are Defendant's Exhibits 17, 18, 19, 20, and
21 to plaintiff's   August 22, 2000 deposition.   For the
employment period January 1998 - December 1998 Jeter on
January 29, 1999 gave her an OVERALL M RATING which essentially
reflects that more is expected of plaintiff.   (Plaintiff's
Exhibit 54 to Jeter Dep.).   The evaluation contains the following
comment from Jeter:

> Sharon performance level has been less than expected.
> There have been several occasions when Sharon has been
> assigned projects and has not completed them.   When
> projects are assigned to Sharon follow-up is always
> required.   When team projects are assigned Sharon tends
> to wait for others to complete the project.   Sharon's
> performance must improve.   Supervisors in this
> organization are expected to lead and set proper
> examples for employees and Sharon has not done this.
> Sharon is very capable of doing an excellent job and
> can excel.   All objectives are achievable if Sharon
> will refocus on helping Zenith succeed.

While plaintiff and Jeter had differences of opinion over how the
office should be run and his assessment of her performance
(Plaintiff's August 21, 2000 Dep. 97-108), the only relevant
reason plaintiff can provide for Jeter exaggerating a great deal
or intentionally misrepresenting his honest assessment of her
performance for the calendar year 1998 was that the January 29,

7

1999 performance evaluation was made about two months after she filed her EEOC charge.[3] (Plaintiff's August 21, 2000 Dep. 97-108). It is noteworthy that plaintiff does not in any way mention that her sex or her race might have been a factor in the bad evaluation of her by Jeter on January 29, 1999.

In late summer and fall of 1998 defendant underwent a corporate restructuring process which resulted in the creation of new positions at defendant's Huntsville facility. Plaintiff claims she was denied seven different positions resulting from this reorganization: Warranty Claims Analyst; Warrant Claims Manager; Factory Outlet Manager; Marketing Manager; Parts Sales Manager; Personnel Specialist; and Customer Service Supervisor. She also claims she was denied the position of Warehouse Supervisor which was available prior to the corporate restructuring. She asserts with regard to each of the eight positions that she was denied the positions because of her sex, because of her race and in retaliation for the filing of her EEOC charge on December 7, 1998.[4] Relevant facts for the positions at issue will be later discussed under the section of this

---

[3] The supplemental EEOC charge was filed February 16, 1999, over two weeks after the January 29, 1999 performance evaluation.

[4] The Warehouse Supervisor's position and the Warranty Claims Analyst position were filled prior to December 7, 1998 and cannot be a basis for plaintiff's retaliation claim.

8

Memorandum of Decision captioned IV. Applicable Substantive Law
and Analysis.

Plaintiff was injured in an automobile accident January 25,
1999 and remained off work until February 15, 1999.  She was also
off work for about two weeks in March 1999 for foot surgery.
Beginning the first of May, 1999, plaintiff commenced treatment
by Dr. Kumaramangalam (also referred to as Dr. Kumar), a
licensed, board-certified psychiatrist, for major depression and
panic disorder.  Plaintiff also underwent surgery July 6, 1999 to
correct excessive uterine bleeding and remained off until July 8,
1999.  Dr. Kumar's associate, Dr. Vasavada, placed her on medical
leave effective July 8, 1999.  On August 2, 1999 Dr. Kumar
continued plaintiff's medical leave through September 10, 1999,
to return to work September 13, 1999.  Plaintiff applied for
short term disability benefits to cover this period.  She
received a letter, dated August 25, 1999, from defendant
informing her that her application was denied based upon findings
of its third party disability carrier, Provident.  (Plaintiff's
Exhibit 65 to Dr. Kumar's deposition.).  The letter, among other
things, instructed plaintiff to return to work on Monday,
August 30, 1999.  The letter expressly informed her that her
"employment with Zenith will be terminated" if she failed to
report as directed.  Plaintiff did not report to work as

9

directed.  By a September 2, 1999 letter from defendant to
plaintiff (Exhibit 9 to plaintiff's August 22, 2000 deposition),
plaintiff was advised that her employment with defendant had been
terminated effective August 30, 1999 "because of your failure to
return to work."  Plaintiff asserts in her complaint that this
termination was because of her sex, because of her race and in
retaliation for her charges filed on  December 7, 1998 and
February 16, 1999 with EEOC.

###   IV.  Applicable Substantive Law and Analysis

Plaintiff has attempted to state claims under 42 U.S.C.
§ 2000e.  Plaintiff advances four theories:  retaliation,
disparate treatment racial discrimination, disparate treatment
gender discrimination, and racial hostile environment.  The Court
is aware that the summary judgment rule applies in job
discrimination cases just as in other cases.  See Chapman v. AI
Transport, 229 F.3d 1012, 1025 (11th Cir. 2000) (en banc)
(rejecting an earlier, contrary general rule and emphasizing that
no thumb is to be placed on either side of the scale).

The analysis of the plaintiff's claims will be determined
not only by the nature of the allegations but also by the quality
of the evidence offered in support of those claims.  See
Standard, 161 F.3d at 1330 (noting that "[t]he analytical

10

framework and burden of production var[y] depending on the method of proof chosen"). In general, a plaintiff may attempt to establish a claim of illegal employment discrimination through the use of direct evidence, circumstantial (indirect) evidence, or statistics. See id.; see also Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999) (recognizing the availability of either direct or circumstantial evidence). A plaintiff's ability to proceed through the use of circumstantial evidence of discrimination is necessarily important because direct proof of discrimination is uncommon. See Combs v. Plantation Patterns, 106 F.3d 1519, 1537 (11th Cir. 1997); Grigsby v. Reynolds Metals Co., 821 F.2d 590, 595 (11th Cir. 1987). Direct evidence is "[s]uch evidence [which], if believed, proves the existence of a fact in issue without inference or presumption." Burns v. Gadsden State Community College, 908 F.2d 1512 (11th Cir. 1990). Cf. Wright v. Southland Corp., 187 F.3d 1287, 1293-94 (11th Cir. 1999) (per Tjoflat, J.) (defining direct evidence as "evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic" and finding the outcomes reflected in prior case law consistent with that definition). However, direct evidence does not include "stray remarks in the workplace" or "statements by nondecisionmakers" or "statements by

decisionmakers unrelated to the decisional process itself."
Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (O'Connor, J.,
concurring) (1989); see also EEOC v. Alton Packaging Corp.,
901 F.2d 920, 924 (11th Cir. 1990) (quoting Price Waterhouse).

Here, plaintiff has presented only circumstantial evidence.[5]
"In evaluating [discrimination] claims supported by
circumstantial evidence, [the courts of this circuit] use the
now-familiar framework established by the United States Supreme
Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93
S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and Texas Department of
Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089,
67 L. Ed. 2d 207 (1981)." Combs, 106 F.3d at 1527.  Under the
McDonnell Douglas and Burdine framework, the plaintiff first has
the burden of establishing a prima facie case of discrimination,
which creates a rebuttable presumption that the employer acted
illegally.  See id. at 1527-28.  The methods of presenting a
prima facie case, as well as the exact elements of the case, are
not fixed; rather they are flexible and depend to a large degree
upon the facts of the particular situation.  See, e.g., Nix v.

---

[5] The use of the word "nigger" by non-supervisor Henderson
on two occasions, the "gorilla" cartoon (Defendant's Exhibit 14
to August 22, 2000 Stewart Dep.) and the "monkey" cartoon
(Plaintiff's Exhibit 47 to Kummerer Dep.) collectively fall far,
far short of direct evidence, even if in some way attributed to a
decision maker.  There is no evidence of any such attribution.

WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984); Lincoln v. Board of Regents of Univ. Sys., 697 F.2d 928, 937 (11th Cir. 1983). In general, a plaintiff establishes a prima facie case of employment discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action but that otherwise similarly situated employees outside the plaintiff's class were treated dissimilarly. See McDonnell Douglas, 411 U.S. at 802.

Once the plaintiff has shown a prima facie case and, thereby, has raised the presumption of discrimination, the burden of production shifts to the employer to proffer a legitimate and nondiscriminatory reason for its actions.[6] See Combs, 106 F.3d at 1528. While the evidence produced must raise a genuine issue of fact as to whether the employer discriminated against the plaintiff, the employer's burden is so light as to be virtually weightless, meaning that the employer need merely put forth a legitimate reason for its actions and need not convince the court that the reason offered was the true, motivating force. See Tipton v. Canadian Imperial Bank of Commerce, 872 F.2d 1491, 1495 (11th Cir. 1989). If the employer satisfies that burden by

---

[6] See Chapman, 229 F.3d at 1032 (A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which the employer based its subjective opinion.).

articulating a nondiscriminatory reason, then the presumption of discrimination falls and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.[7]  Where the defendant articulates multiple, reasonable, legitimate and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons.  <u>Chapman</u>, 229 F.3d at 1024-25. Although the prima facie case is irrelevant once the employer has offered a legitimate reason for its actions, the evidence of pretext may include the same evidence offered to establish the prima facie case.  <u>See</u> <u>Combs</u>, 106 F.3d at 1528.

Despite this shifting of the burden of production between the plaintiff and the defendant under the <u>McDonnell Douglas</u> and <u>Burdine</u> framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  <u>Burdine</u>, 450 U.S. at. 253.  Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a summary

---

[7] If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  Simply quarreling with that reason is not sufficient.  <u>Chapman</u>, 229 F.3d at 1030.

14

judgement either by proving that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination. See Reeves v. Sanderson Plumbing Prods., Inc., 120 S. Ct. 2097, 2108-09 (2000) (pointing out that the production of the necessary sufficient evidence by plaintiff will not always prevent the employer from prevailing on a Rule 50 motion and suggesting that the strength of plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other properly considered evidence that supports the employer's case are among other factors to take into account in evaluating a Rule 50 motion);[8] St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000); Alexander v. Fulton County, 207 F.3d 1303, 1336 (11th Cir. 2000); Combs, 106 F.3d at 1529-38 (interpreting Hicks and the post-Hicks case law); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 920-21 (11th Cir. 1993).

---

[8] The court in Chapman modified the statement in Combs contrary to this holding in Reeves after noting that the standard for granting summary judgment mirrors the standard for judgment as a matter of law.  See Chapman, 229 F.3d at 1025 n.11.

Generally, to establish a prima facie case of disparate treatment racial or gender discrimination a plaintiff must show: (1) that she is within a protected class; (2) that she suffered an adverse employment action; (3) that she was treated less favorably than otherwise similarly situated employees [of other races/sexes]; and (4) that plaintiff was qualified [for the position at issue].  See McDonnell Douglas Corp., 411 U.S. 792, 802 (1973).

Generally, to establish a prima facie case of retaliation a plaintiff must show:  (1) that she engaged in protected activity; (2) that her employer was aware of that activity; (3) that she suffered an adverse employment action; and (4) there was a casual link between her protected activity and the adverse employment action.  Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999) (citing Little v. United Techs., 103 F.3d 956, 959 (11th Cir. 1997)).

Generally, to establish a prima facie case of racially hostile work environment a plaintiff must show:  (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) the harassment complained of was based upon race; and (4) the harassment complained of affected a term, condition, or privilege of employment.  See Henson v. City of Dundee, 682 F. 2d 897,  903-04 (11th Cir. 1982).

16

Defendant argues that plaintiff has failed to present evidence sufficient to establish a prima facie case and that even if a prima facie case were present, legitimate, non-discriminatory reasons have been articulated for the challenged employment decisions and plaintiff has failed to present evidence sufficient for a reasonable jury to conclude that defendant's articulated legitimate reason is merely a pretext for illegal discrimination. <u>Chapman</u>, 229 F.3d at 1024-25.

### A.   Hostile Environment Claim Based on Gender and Race[9]

In order for a plaintiff to establish a prima facie case of "hostile work environment" harassment under Title VII, the incidents of harassment must be "so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment. . . .'"[10] <u>Faragher</u>, 524 U.S. at 786 (citing <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 67 (1986)); <u>see</u> <u>also</u> <u>Edwards v. Wallace Community College</u>,

---

[9]  Plaintiff's brief expressly abandons any hostile environment claim based upon gender. (Plaintiff's Br. 20-23).

[10]  Although both <u>Faragher</u> and <u>Meritor</u> involved clams for sexual harassment, not racial harassment as also alleged in this case, the Supreme Court has noted that "[even though] racial and sexual harassment will often take different forms, and standards may not be entirely interchangeable, we think there is good sense in seeking generally to harmonize the standards of what amounts to actionable harassment." <u>Faragher</u>, 524 U.S. at 787 n.1.

49 F.3d 1517, 1521 (11th Cir. 1995).  Title VII is not "a general
civility code" nor does it protect against "'the ordinary
tribulations of the workplace, such as the sporadic use of
abusive language, gender-related jokes, and occasional teasing.'"
Faragher, 524 U.S. at 788 (citing B. Lindemann & D. Kadue, Sexual
Harassment in Employment Law 175 (1992) (footnotes omitted)).
Infrequent or "isolated incidents (unless extremely serious) will
not amount to discriminatory changes in the 'terms and conditions
of employment'" to constitute a violation of Title VII.[11]
Faragher, 524 U.S. at 788 (citation omitted).  The severity of
the behavior in each case must be evaluated both objectively[12]
and subjectively considering all the circumstances, see Oncale v.
Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998), and only
the most extreme harassing conduct will be found to violate
Title VII, see Faragher, 524 U.S. at 788; Oncale, 523 U.S. at
81-82.

---

[11]  However, the determination as to whether the harassment
was sufficiently severe or pervasive should not be based solely
on the number of incidents alleged.  See Vance v Southern Bell,
863 F.2d 1503, 1510 (11th Cir. 1989).

[12]  The objective evaluation is based on a "reasonable
person" standard.  See Watkins v. Bowden, 105 F.3d 1344, 1355-56
(11th Cir. 1997) (affirming the use of the "reasonable person"
standard in a hostile work environment claim where the plaintiff
argued that the court should have applied a more contextual
standard such as "a reasonable African-American person.")

The standard for a racially hostile environment is high: "[not] all racial slurs rise to the level of a Title VII violation." Johnson v. Bunny Bread Co., 646 F.2d 1250, 1257 (8th Cir. 1981). "The racial slurs allegedly spoken by co-workers [have] to be so 'commonplace, overt and denigrating that they created an atmosphere charged with racial hostility.'" Edwards, 49 F.3d at 1521 (citing E.E.O.C. v. Beverage Canners, Inc., 897 F.2d 1067, 1068 (11th Cir. 1990)). The Supreme Court has noted that the "'mere utterance of an . . . epithet which engenders offensive feelings in an employee,' does not sufficiently affect the conditions of employment to implicate Title VII." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (quoting Meritor, 477 U.S. at 67). Factors to be considered include the frequency of the racial terms, whether the speaker directed the comments to the plaintiff, and whether the worker made the remarks accidentally and/or as part of casual conversation. See Bunny Bread, 646 F.2d at 1257. Also relevant is whether the utterance was made in the presence of others so as to further humiliate the employee. Racial slurs that are "largely the result of individual attitudes and relationships . . . certainly [are] not to be condoned, [but nonetheless] do not amount to violations of Title VII." Id.

19

Measuring the paucity of evidence plaintiff has presented in support of her hostile racial and gender (see footnote 9, _supra_) environment claims against the foregoing applicable law, plaintiff has not even established a prima facie case.  The use of the word "nigger" by co-worker Henderson on two occasions, the "gorilla" cartoon (Defendant's Exhibit 14 to August 22, 200 Stewart Dep.) and the "monkey" cartoon (Plaintiff's Exhibit 47 to Kummerer Dep), collectively, do not come close to reflecting a work atmosphere either "charged with racial hostility" or abusive.  _Edwards_, 49 F.3d at 1521.  And plaintiff has come forward with simply no evidence in support of her abandoned gender related hostile environment claim.  The Supreme Court has repeatedly emphasized that these type claims are limited to extreme work conditions.  _See, e.g._, _Faragher_, 524 U.S. at 778; _Oncale_, 523 U.S. at 81.  Viewing the totality of the circumstances, reflected by the undisputed facts, as supplemented by evidence offered by plaintiff which may be disputed, plaintiff's workplace cannot be characterized as an "atmosphere charged with [gender-based or race based] hostility.  _E.E.O.C. v. Beverage Canners, Inc._, 897 F.2d 1067, 1068 (11th Cir. 1990).  Having failed to present a prima facie case, the motion of defendant for summary judgment in its favor as to plaintiff's

hostile racial and gender environment claims is due to be granted.

### B. Gender, Racial and Retaliatory Termination Claims

Plaintiff's complaint asserts that she is pursuing a claim for termination of the employment based upon racial, gender and retaliatory grounds.  In response to the motion for summary judgment and defendant's brief in support thereof, plaintiff in her brief only argues retaliation to support her termination claim.  Neither by her evidence nor by her brief has plaintiff made a sufficient showing of a racial or gender related animus associated with her termination to support a prima facie case, and for this reason alone defendant is entitled to summary judgment in its favor on any race or gender related termination claim.  Graham v. State Farm Mutual Insurance Company, 193 F. 3d 1278, 1281-82 (11th Cir. 1999); Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995)(grounds alleged in the complaint but not relied upon at time of summary judgment are deemed abandoned).  Moreover, even assuming a prima facie case of a gender or racially based termination claim were present, like her retaliation termination claim discussed below, plaintiff has failed to rebut defendant's proffered reasonable, legitimate and non-discriminatory reason for plaintiff's termination.  For that

reason also, plaintiff cannot prevail on her gender and racial termination claims.

Turning to plaintiff's retaliation termination claim based upon the filing of her EEOC charge on December 7, 1998 (supplemented February 16, 1999), the court will assume, without deciding, that a prima facie case has been established.[13]

It is undisputed that plaintiff had a series of medical absences beginning January 25, 1999. The last such absence began with a medical leave on July 6, 1999 which was scheduled by Dr. Kumar to end September 10, 1999. Plaintiff applied for short term disability benefits to cover this period but received a letter dated August 25, 1999, from defendant informing her that the application was denied based upon findings of defendant's third party disability carrier, Provident. (Plaintiff's Exhibit 65 to Dr. Kumar's deposition). The letter also instructed plaintiff to return to work on Monday, August 30, 1999 or her "employment with Zenith will be terminated" if she failed to report as directed. Plaintiff did not report to work as directed and has not offered any evidence or argument to rebut

---

[13]   The causal link between the protected activity (which occurred December 7, 1998 and February 16, 1999) and plaintiff's termination (which occurred August 30,1999) is extremely doubtful, particularly in view of the undisputed events occurring from January 25, 1999 until plaintiff's termination on August 30, 1999.

defendant's proffered reasonable, legitimate and non-discriminatory reason for plaintiff's termination.  Further, the strength of plaintiff's assumed prima facie case is extremely weak and the evidence supporting defendant's articulated reason is strong and undisputed.[14]  Defendant's motion for summary judgment in its favor as to plaintiff's retaliatory termination claim is due to be granted.[15]

### C.  January 29, 1999 Performance Evaluation for 1998

Plaintiff seeks to redress an alleged adverse employment action in the form of the January 29, 1999, performance evaluation for 1998 by her supervisor, Dewayne Jeter.  She asserts that Jeter's report was gender motivated, racially motivated and in retaliation for her December 7, 1998 EEOC charge.[16]

The disparate treatment section of plaintiff's brief (pages 24-27) contains no reference whatsoever to the January 29, 1999 performance evaluation.  There is simply no argument made by

---

[14]   See footnote 8, _supra_.

[15]   The court notes also that plaintiff has not identified a single employee even arguably similarly situated to her who was treated differently than plaintiff.

[16]   The supplemental EEOC charge was filed February 16, 1999, two weeks _after_ the January 29, 1999 evaluation.

23

plaintiff to support her assertion that Jeter's report was gender or racially motivated. This is not surprising since the only relevant reason plaintiff could provide during her deposition to support her belief that Jeter had "exaggerated" to her detriment in making the performance evaluation was the fact that she filed her EEOC charge on December 7, 1998. (Plaintiff's August 21, 2000 Dep. 97-108). She did not even suggest, much less demonstrate, that her sex or race may have played a part. As noted earlier, the January 29, 1999 performance evaluation may not even rise to the level of an adverse employment action. <u>See</u> <u>Gupta v. Florida Board of Regents</u>, 212 F.3d 571, 587 (11th Cir. 2000). But assuming that it does, it is undisputed that Jeter made the decision to hire plaintiff in July 1997; that about two months later Jeter promoted her to the position of Customer Service Supervisor without "posting" the position; and that for her employment period July 1997 - December 1998 Jeter gave her a rating which essentially reflects that she achieved expectations. (Plaintiff's Aff.; Jeter Dep. 30-31 and 101). And it is further undisputed that as early as January 1998 and continuing through 1998 plaintiff and Jeter were discussing a variety of problems Jeter was raising regarding plaintiff's performance. (<u>See</u> footnote 2, <u>supra</u>). Defendant has pointed out that these problems were the reason for the January 29, 1999 performance

evaluation and plaintiff has not offered any evidence or argument to rebut defendant's proffered reasonable, legitimate and non-discriminatory reason.[17]  Defendant's motion for summary judgment in its favor as to plaintiff's race and gender related claims with regard to the January 29, 1999 performance evaluation is due to be granted.[18]

Plaintiff does, in the retaliation section of her brief (pages 14-19), argue that the January 29, 1999 performance evaluation was in retaliation for the December 7, 1998 EEOC charge.  Unlike the race and gender claims based thereon, the performance evaluation likely rises to "some threshold level of substantiality" so as to satisfy the requirement of an adverse employment action.  Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir. 1998).  As noted in the preceding paragraph, Jeter, who had been a strong supporter of plaintiff from the time he employed her in July of 1997 until the end of 1997, began as early as January 1998 pointing out and discussing with plaintiff specific problems he had with her performance.

---

[17]  The court also notes that there is a total absence of evidence that a male or white employee similarly situated to plaintiff was treated more favorable.

[18]  Alternatively, plaintiff has abandoned her racial and gender related claims with regard to the January 29, 1999 performance evaluation by not arguing such claims in her brief. Graham, supra.; Resolution Trust Corp., supra.

Some of the problems are more specifically set out in the first full paragraph in this Memorandum of Decision under the heading **"III.   Relevant Undisputed Facts**," including footnote 2 therein. Virtually all of these problems or concerns of Jeter arose <u>before</u> the filing of the EEOC charge on December 7, 1998 and are more than reasonable legitimate and non-discriminatory reasons for Jeter's January 29, 1999 performance evaluation.   Plaintiff has not produced evidence sufficient to allow a rational trier of fact to disbelieve these reasons.[19]   Defendant is entitled to summary judgment in its favor on plaintiff's claim that her January 29, 1999 performance evaluation was in retaliation for her December 7, 1998 EEOC charge.

### D.   Promotion Disparate Treatment Claims

As Noted Earlier under the heading "**III. Relevant Undisputed Facts**," plaintiff claims she was denied, on the basis of race, gender and retaliation, a promotion to seven different positions resulting from the restructuring defendant underwent in the Fall of 1998:   Warranty Claims Analysis, Warranty Claims Manager, Factory Outlet Manager, Marketing Manager, Parts Sales Manager,

---

[19]   Indeed, as a result of defendant's strong showing, one could easily conclude that the casual link element of plaintiff's prima facie case has not been established on this claim.

26

Personnel Specialist and Customer Service Supervisor.  She also claims she was denied, for the same reasons, a promotion to the position of Warehouse Supervisor which became available prior to the restructuring.  Defendant separately addressed in its brief each of these promotion opportunities, definitively articulating why plaintiff was not promoted to each position.  Plaintiff, in her brief responding to the summary judgment motion and defendant's brief, only addressed the positions of Warranty Claims Analyst and Parts Sales Manager (Pl. Br. 24-27).  The court will do likewise, plaintiff having abandoned her claims for the other six positions.  Graham, supra; Resolution Trust Corp., supra.  Thus defendant is entitled to summary judgment in its favor as to all claims of plaintiff associated with those six positions not argued by plaintiff.

In early fall, 1998, the position of Warranty Claims Manager was available.  Douglas Heaton, director of warranty operations for defendant, traveled from Zenith's corporate headquarters in Illinois and interviewed applicants from within and from outside defendant.  Heaton made the decision to hire Robert Sparks, a white male, instead of plaintiff.  (Heaton Aff.)  Although Heaton viewed plaintiff as qualified for the position, he viewed Sparks better qualified.  (Id.)  Heaton selected Sparks largely because of his financial analysis experience and background and also

because he viewed Sparks as very customer service oriented.
(Id.)  Plaintiff's experience largely was in the areas of human
resources, implementing company policies, structuring work flow
and assignments, quality control and inventory control.
Plaintiff had no experience in financial analysis.  (Defendant's
Ex. 4 to Plaintiff's August 21, 2000 Dep.)  Sparks possessed a
bachelor's degree in business administration.  (Id.)  Plaintiff
possessed a high school diploma and an "Equivalent" associate
degree in business administration as a result of two years at
Faulkner University.[20]  (Ex. A to Plaintiff's Aff.)  There is
simply no evidence from which a rational trier of fact could
conclude that Heaton had a racial or gender related animus or
that plaintiff's race or gender was a factor at all in his
employment decisions.  Plaintiff's "beliefs" that her race was a
factor in the decision by Heaton certainly is not such evidence.
(Plaintiff Dep. 274-283).

   Plaintiff's entire argument in her brief regarding disparate
treatment associated with her promotion claims is set forth on
pages 24 to 27 of her brief.  There she argues that she has
presented a prima facie case with regard to the positions of
Warranty Claims Manger.  There is no doubt that plaintiff has

---

   [20]  Plaintiff was at the time also taking courses at Athens
State College.

presented a prima facie case of racial and gender discrimination related to the filling of the position of Warranty Claims Analyst in October of 1998.[21]  However, there is also no doubt that defendant has proferred a reasonable, legitimate and non-discriminatory reason for selecting Sparks over plaintiff. Plaintiff then correctly points out that she is not required to prove that her qualifications are superior to those of Sparks. But if she fails to rebut defendant's articulated reasons in this or some similar fashion, plaintiff must at least produce evidence sufficient to allow a rational trier of fact to disbelieve the articulated reason.  As to the Warranty Claims Analyst position, plaintiff has neither rebutted defendant's articulated legitimate reason nor produced evidence sufficient to allow a rational trier of fact to disbelieve the articulated reason.  The motion of defendant for summary judgment in its favor as to plaintiff's claims associated with the filling of the position of Warranty Claims Analyst is due to be granted.

On or about February 19, 1999, plaintiff's supervisor, Dewayne Jeter, resigned from his position as Parts Sales Manager.

---

[21]  She has not, however, established a prima facie case as to her retaliation claim on the position.  The EEOC charge which serves as the basis for the alleged retaliation was not filed until December 7, 1998 about two months after the position was filled. For this reason, among others, defendant is entitled to summary judgment in its favor on that retaliation claim.

Jeter's manager, David Dale Phipps, interviewed plaintiff and others for the position in early March, 1999, and made all relevant employment decisions with regard to filling that position. (Phipps Dep. 53-87). As a result of the interviews Phipps did not find a person that he felt was suitable for the position, and he was under pressure to reduce the number of employees, so he decided not to fill the position of Parts Sales Manager. (Phipps Dep. 59-60).[22] Phipps decided to directly manage the two supervisors (including plaintiff) which Jeter had managed. (Phipps Dep. 53-60). There is no evidence from which a rational trier of fact could conclude that Phipps had a racial or gender related animus or that plaintiff's race or gender was a factor at all in the decisions of Phipps not to fill Jeter's position of Parts Sales Manager with plaintiff or with anyone else. Phipps' decision to yield to the pressure to reduce the number of employees is a reasonable legitimate and non-discriminatory reason and plaintiff has neither rebutted such reason nor produced evidence sufficient to allow a rational trier

---

[22] These decisions were made prior to June 1999, and it was after June 1999 that Phipps first learned that plaintiff had filed charges with the EEOC. (Phipps Dep. 87). There is simply no evidence of a causal link to those charges and Phipps' decision regarding the position of Parts Sales Supervisor. Defendant's motion for summary judgment with regard to her retaliation claim associated with that position is due to be granted.

of fact to disbelieve such reason.  The motion of defendant for summary judgment in its favor as to plaintiff's claims associated with the filling of the position of Parts Sales Manager is due to be granted.

In summary, the court finds that no material issues of fact remain and that defendant Zenith Electronics Corp. is entitled to judgment as a matter of law as to all claims asserted by plaintiff.  A separate order will be entered.  The pretrial conference scheduled for February 1, 2001 is **CANCELLED**.

DONE this _22^nd_ day of January, 2001.

_____
SENIOR UNITED STATES DISTRICT JUDGE

31